The first case we'll hear is United States v. Allergan, No. 17-1014. May it please the court, I am Dan Miller. I have the privilege of representing the relator in this action, Ronald Streck. I'd like to reserve five minutes for rebuttal. That'll be granted. Thank you, Your Honor. The district court's first error in this case was incurred sua sponte. Neither the relator or any of the nine service fee defendants argued that AMP, average manufacturer's price, once reported, is fixed or static. That is because by statute and regulation, AMP is fluid. Specifically, the implementing regulations... The rebate agreement says that too, right? Basically. Yes, Your Honor. The rebate agreement actually goes into more detail and specifically says that any, quote, other arrangements that affect the price actually realized, in other words, the money that is pocketed, has to be included in AMP. And I was going to cite the regulation as it's noted in the brief. There are also government guidances issued in 1994 and 1991 that say the same thing. Namely, that AMP, once reported, the manufacturers are under an obligation to adjust their AMP if they receive additional revenue. Nonetheless... I mean, I printed out here the 1994 one. It seems, though, rather vague. It's just sort of a repeat of, you know, if things change, adjust accordingly, right? I mean, it doesn't really talk specifically about the arrangement here, does it? I think it does, Your Honor, because it talks about price. And this arrangement here has nothing to do with anything but price. The defendants raised prices, pocketed the money, and didn't report it. When you break it down, it's that simple. So we think the regulations are clear. And the guidance. As noted, the district court found, and this is the first error, that the price paid to the manufacturer under AMP is just that, the price initially paid to the manufacturer by the wholesaler. The district court specifically found that AMP does not include any additional profits that the manufacturers claw back after a price increase. And as noted, the statute itself specifically says that AMP is defined as the price received by the manufacturer for the drug. It doesn't say anything about the initial price. And all the regulations and guidance thereafter are uniform in one sense, and that is that if you raise prices and you gain additional revenue, that has to be factored into AMP. But wasn't that language specifically related to the arrangements that now exist? And the judge was concluding that the so-called price appreciation credits were not part of revenue, and therefore the AMP in this specific circumstance was the price that the distributors had paid to the manufacturer for those specific drugs. If I understand Your Honor's question correctly, that's correct. And this is what the district court reasoned. He was wrong because even the manufacturers in their agreements, say, specifically define price increases on inventory as being a price appreciation credit. So in other words, you can call a price increase whatever you want to call it, but if you raise prices and you take the money and you put it in your own pocket, that's price. But you were suggesting that the district court erred by concluding something that no one had argued, and I'm suggesting that he didn't say that AMP is static. He was saying in this particular case, because I am not considering that the price appreciation credits are the additional revenue or additional price for the drug, that the AMP was the price paid. He was not concluding that AMP was static. Judge, respectfully, I would disagree. The language directed from the opinion is AMP does not include, quote, any additional profits manufacturers call back after a price increase. So he did find that AMP was static. He didn't use that word, but he said that AMP is defined as what's initially reported. The district court's second error was also sua sponte. Neither the relator nor any of the nine service fee defendants argued that AMP should be analyzed or defined from the perspective of the wholesaler. Yet the district court found that the wholesaler was who you should look at when determining AMP. He, quote, the price credit does not appear to alter the wholesaler's initial profits, and therefore it does not alter the price the wholesaler paid for the drug. Respectfully, we think or we know that the law is not and AMP is not defined by the perspective of the wholesaler. The sole perspective of AMP is how much money did the manufacturer get paid for the drug. Your Honor, we are essentially arguing here that there's a sleight of hand. The manufacturers raise prices. Excuse me. They call back that money for the price increases. They put it in their pocket. And over here, the sleight of hand worked. The district court followed the confusion in the industry, allegedly, regarding the definition of a service fee. But service fees and price are completely separate issues. There's rights for price, and then there's rights for service fees. Service fees are payments from the manufacturer to the wholesaler. They have nothing to do with the money that the wholesaler pays to the manufacturer for the drug. But the district court said that, and I guess I'll quote this, the service fees, I guess, regulations were, their interpretation was not unreasonable, let alone recklessness, for the companies to have concluded that they were doing right. Yes. And what I would say to that, Your Honor, is... Is it so clear, though? It's absolutely clear. If you keep your eye on the money, if you look over here and look at the regulation of service fees, think of it this way. The relevant transaction, the important decision, wasn't directing the contracts, the language of the contracts. All of that's fine. If you want to make a deal with somebody and pay them a service fee based on volume of sales and call back your price appreciation, there's nothing illegal about that. The defendants in this case got it right, in other words. They defined bona fide service fee, even though there was some ambiguity in the definition of a service fee. They concluded correctly that those payments should be excluded from AMP. Well, if this is so clear, counsel, I read the OIG report from May 30, 2006, and apparently the industry just said, we don't know. We have no idea. That's exactly what I'm trying to argue to the court. If you look at all of those quotes, none of them talk about price. All of that confusion that existed, every iteration of that confusion related to the definition of a bona fide service fee. But the defendants here got it right. In other words, through their confusion, they decided, okay, a bona fide service fee should be excluded from AMP. The question is, what did you do next? They inserted these price appreciation clauses again, which is fine. But when that money came back, that's price. If you raise prices and you go take the money. But isn't this something for the Office of Medicare or Medicaid to decide whether this is or is not, as opposed to claiming that this is a fraud under the False Claims Act? Your Honor, respectfully, no, I don't believe so. The government is not obligated to create regulations for every contractual artifice that a clever industry like the pharmaceutical industry can come up with. In fact, in this instance, these contracts were all confidential. The government had no visibility into price appreciation clauses. And were they under an obligation to regulate everything that occurs? The regulations that matter are the ones that relate to price. The money from the purchaser to the manufacturer. It was always clear to every one of these defendants that when you get paid money for a drug, that's AMP. Yet they took that money and jammed it into a service fee, even though service fees go the other direction, and then they magically call it part of the service fee. From an analytical standpoint, it would be equivalent to jam that into the fees paid to Comcast for your Internet service. It's a fee paid by the manufacturer to the service provider. Allegations against one of the defendants stand out to suggest that perhaps one of the claims survives a motion to dismiss, and that is Esai. I don't know if I'm pronouncing it correctly, but Esai? Esai, yes. Esai. Are they more specific in terms of laying out? Because there's allegations about communications between Streck and the executives at Esai that suggest Esai might have been deliberately ignorant as opposed to a reckless disregard of the requirements. Judge, respectfully, we would argue that Esai is just like everyone else. We just happen to have some more information about Esai than we did the other defendants. The bottom line is we have the dates of the contracts. We have the signatures of the executives. We have rich detail, as the district court found, that we met nine-day with regard to this, rich detail of what's in the contracts, how the price appreciation clauses work, the dates of the price increases that the manufacturers issued, the utilization by Medicaid of the drugs upon which the prices were raised, and we even provided an exemplar to the complaint of the actual claim form that the defendants use when they report their rebate. The only thing we don't have is the actual claim itself, and the only one that had that are the defendants. There's no difficulty defending here based on ambiguity or lack of detail. All right. Thank you, counsel. Thank you, Your Honor. Good morning, Your Honors. I'm Casey Flint, here for the defendants. As the questions recognize, this is a False Claims Act case, and the False Claims Act doesn't exist to police regulatory violations. That's what the regulator is there for. And it's firmly established that a party doesn't commit fraud in violation of the False Claims Act when it follows a reasonable interpretation of ambiguous regulations. Can I just ask you, I mean, just to respond directly to what your adversary came out with, is AMP static? No, AMP's not static. And I would agree with what Judge Bolton was suggesting about the district court's interpretation. I don't believe the district court held that AMP is static. The regulations do provide for AMP to be adjusted if subsequent events cause price to be adjusted. The question in this case, though, isn't whether AMP is static. The question is whether these price appreciation credits are a component of bona fide service fees, which everyone agrees, including Mr. Miller just now, everyone agrees are not to be included in the calculation of AMP, or whether price appreciation credits are part of price. So the timing isn't really crucial to this. And I don't think the district court's ruling didn't depend on any conclusion that AMP was static. So I want to talk a little bit about how these price appreciation credits actually work and why it was reasonable in light of the ambiguity that existed for the defendants to treat them as bona fide service fees rather than as a component of price. As we just discussed, bona fide service fees, it's clear, have to be excluded from the calculation of AMP. And the manufacturers here included in part of their bona fide service fee price appreciation credits. A service fee, to be a bona fide service fee, has to reflect the fair market value of the services that the distributor is providing to the manufacturers. And the price appreciation credit confirms, makes sure, that in every reporting period, what the distributor actually receives is the negotiated fair market value for its services. Did the price appreciation credit kick in only where there were excess inventory, excess stock that had been purchased by the wholesaler? The price appreciation credit kicked in on inventory that the distributor had on hand at the time of the price increase. How that affected the calculation of the service fee differs a little bit from one contract to another. Overall, the most common practice among these contracts, as alleged in the complaint, was that if the service fee was, let's say, a hypothetical example, a million dollars of drugs purchased by a distributor from a manufacturer with a service fee of 5% or $50,000. If there's no price increase, what happens is manufacturer gets a million dollars, distributor gets drugs, and then at the end of the period distributor gets the $50,000 in service fee. Let's say there is a price increase, and when it's applied to the inventory that the manufacturer has on hand, it causes the inventory to appreciate in value by $25,000. Now the credit kicks in and says, you get to keep that $25,000, distributor, but we're going to use it, we're going to offset it against what we owe you for the service fee, so now we're going to pay you $25,000 to get you up to what we agreed is the fair market value for the services you've provided us, $50,000. Manufacturer still has a million dollars, what it was paying, distributor still has $50,000. And that's the purpose of these credits, to keep those numbers the same. And another reason why manufacturers used these credits was to eliminate any incentive on distributors to retain inventory for excessively long periods. That was necessary when the industry moved to this service fee model. Before this move, which happened in the early 2000s, and this move is election complaint, well known to the public and the regulators. So in the early 2000s, the industry said, we don't like the way distributors are holding onto product for all this time in the hopes of a price increase, it's causing a lot of problems, we want to start paying you for your services, but if we just start paying you every month, you might as well take our money and also hold onto inventory for an excessively long time, and that's not going to work. You'll have too much money, you'll be paying a fair market value for your services, plus you'll have this additional money, and all the same problems will still be there. So they devised these credits, and they said, this is part of the bona fide service fee. You're saying they, who's they? I'm talking about the manufacturer defendants. And so we're going to treat it as part of the bona fide service fee. Now, Mr. Streck doesn't like that reading. That's Mr. Streck, I'm sorry, Mr. Miller, was just out here arguing. Mr. Miller and Mr. Streck believe that these price appreciation credits are tied more closely to price than they are to bona fide service fee. Well, the defendants disagree. The defendants treated them as part of the bona fide service fee because that's how they operate, because that's why they were started. But, you know, maybe Mr. Streck has a good reading of the statute and regulations. Maybe the court will think he has a better reading of the statute and regulations, but that doesn't matter. What matters here is scienter. And under Safeco, whether the Supreme Court's decision in Safeco, whether the defendants had the best reading of the statute and regulations or not, there's no scienter if their reading was a reasonable interpretation of ambiguous regulations. So it is not clear, as your adversary would say, that the regulations prohibit this. No, absolutely not. The position that Mr. Streck has taken and that Mr. Miller articulated today is that anything that goes to the bottom line of the manufacturer should be treated as price. The manufacturer is better off if they're credited, if there's a credit against their service fee. So if that means it has to be treated as price, that is not the case. So you would agree that the government could come back and say, no, we're going to make you do this under AMP to credit this against your average monthly price. Right. If the government said, we, CMS, have determined that you should start treating this, including it as part of average manufacturer price, that would be a reasonable interpretation. But it certainly wouldn't make what the defendants had done 10 years or however long before that interpretation came into place, fraud. Go ahead. I just wanted to be sure that the regulations that you've cited in your briefs are, there's been no further issuance of regulation or guidance since, I believe it was in 2016? Not that I'm aware of, Your Honor. Okay, thank you. In 2016, in the preamble to the final regulations, CMS addressed price appreciation credits, and at that time it said, we are aware that a lot of manufacturers are using price appreciation credits. And that goes to the question of whether this was some nefarious secret plot or something. CMS said, we know lots of people are doing this, lots of companies. We know that there are a lot of arrangements that are described as price appreciation credits, and at this point, we think it's likely that price appreciation credits are not part of bona fide service fees because our understanding is they are not used to offset bona fide services. So to me, when I read that preamble, it sounded like CMS is still open to trying to figure it out. I agree with you, Your Honor. That's how I read it as well. But Mr. Strzok reads it to say that price appreciation credits of the type that are used in these contracts are foreclosed. Even if he's right about that, that doesn't make these defendants liable under the False Claims Act for actions that they took in 2006 and 2007. What if we actually asked HHS to weigh in and say, during this time period, what was your understanding? And then let you guys comment on what they comment on. What would matter is what they said at the time. Even if they said, now looking back, it would have been great if we had come out and said, here's how we think you should calculate these things. But what matters is what they said at the time. And what they said at the time is exactly what Your Honor said when Mr. Miller was up here. They said in 2006 in that OIG report, gosh, our regulations are not clear and comprehensive. We know that people are using a lot of different methods and inconsistent methods to calculate average manufacturer price. And what we're instructing you manufacturers to do is to use reasonable assumptions, your own reasonable assumptions. That's their words, reasonable assumptions when you try to figure these things out. Now, Mr. Miller tried to say that the ambiguity that existed only related to service fees and there was no ambiguity about price. Well, service fees are exactly the question here. Service fees, whether these price appreciation credits were properly part of service fees, is the crucial regulatory question. And that wasn't answered in 2006. It wasn't answered in the final regulation in 2007. And it wasn't even addressed until the regulations that we were just talking about, Judge Bolton. And I think even then it wasn't addressed unambiguously. Are service appreciation credits still in place in the industry? Your Honor, that's not in the record. All right, very well, that's fine. All right, I also want to talk about the absence of factual allegations in the complaint. The state of claim for fraud, of course, Mr. Strzok had to allege not only that each and every defendant acted with scienter, but also had to allege under Rule 9b the who, what, when, where, and how of the fraud. And the complaint just does not do that. Let me first start by talking about Defendant Isay, Your Honor, that you were asking about. The complaint doesn't allege what needs to be alleged for any of the defendants, including Isay. So what the complaint does is give contracts between the manufacturer defendants and some distributors. Some of the contracts say which the distributor is. In some cases it's redacted. That's all it does. It doesn't allege any specific facts about transactions that actually occurred such that price appreciation credits kicked in. It doesn't allege that any manufacturer actually enforced price appreciation clauses. It doesn't allege anything about how any manufacturer calculated or reported AMP. And most importantly for liability under the False Claims Act, it doesn't allege what any manufacturer actually paid for Medicaid rebates and whether that was materially less than it would have been apart from price appreciation credits. Nevertheless, the district court disagreed with you, right? That's right. The district court disagreed. I think, Your Honor, on a fair reading, Rule 9b was an alternative ground for dismissing this case. And I'd actually like to highlight something Mr. Miller said when he was up here. He said the contracts themselves aren't a problem. They can contract for anything they want with these distributors. The problem is when you get to reporting things to CMS. Well, that's exactly what the complaint doesn't tell us anything about. I think that Mr. Miller said in his reply that that information is confidential and not available to anyone except your clients and CMS. Mr. Miller said he doesn't have access to these facts. But, Your Honor, he's the relator here. He needs to allege every element of the claim and he needs to satisfy Rule 9b. Did they have to get there? I mean, did the district court even have to do the 9b analysis based on the beginning, the first ruling in the decision? No, Your Honor. Once the district court had determined, oh, I'm sorry, the district court did have to address Rule 9b with respect to the discount defendants. But for the service fee defendants, the only ones at issue here, they were dismissed on Sanger and it didn't need to address whether the claims against them were adequately alleged under Rule 9b. And I want to emphasize a key point for both Sanger and Rule 9b. This is a really complex area of regulation. Mr. Miller has tried to argue all that matters here is how much money the manufacturers make. And if you know the manufacturers are making more money, that means A&P has to be higher. But that's really not accurate. Average manufacturer price is a statutorily defined term and there's a host of regulations spelling out how it is supposed to be calculated. One thing we know for sure from the regulations, no dispute here, is that bona fide service fees must be excluded from A&P. If we agree with the district court in the dismissal of these defendants on the false claims act cause of action,  do they necessarily fall as well? Two things, Your Honor. They necessarily fall. I don't think they're actually raised in this appeal because they weren't addressed in the opening brief. Actually, the statement of issues refers to the false claims act. It doesn't refer to any state false claims act. But aren't they coextensive? The absence of Sanger is a reason to dismiss all of them. But there were additional grounds for dismissing the state law claims, at least some of them, which were not addressed in the opening brief. The reply brief suggests that those additional grounds related only to the discount defendants. That's inaccurate. There were reasons like the New Hampshire False Claims Act requires, I believe this is right, the state to intervene for you to pursue a claim. That applies equally to all the defendants. But I want to emphasize a lower A&P does not automatically benefit the defendant. This is a really complex regulatory area. The Supreme Court actually talked about this very question in the Astra case, which we cite in our brief. In that case, it said higher A&P tends to produce higher Medicaid rebates. Lower A&P tends to benefit the federal government under the 340B program. So courts, you should be very careful if you're wading into things like calculation of A&P because there are a lot of interlocking parts, and that's the regulator's job. And, Your Honor, given that the regulators didn't address this question and given that Mr. Freck's complaint doesn't allege the specific facts necessary to conclude that the government lost money as a result of this, there's no claim under either Rule 9B or the requirement for alleging scientra. For those reasons, Your Honor, we ask the Court to affirm. Thank you, counsel. I want to first address Judge Bolton's question about the recent CMS regulations and the definition of or how they categorize price appreciation credits. Judge, the defendant's brief only quotes the first clause. The real definition specifically is on page 19 and 20 of our brief where CMS makes it entirely clear that price appreciation credits have nothing to do with service fees and should be included in A&P. But you do agree that the 2016 regulation is the operative regulation today, but there's been nothing subsequent. I agree with that, Your Honor. Judge, this is really frustrating on our end in the sense that it is complicated in the sense that there's a lot of regulations and so on. But when you really look carefully at this, a service is when the wholesaler is doing something for the manufacturer and gets paid for it. All of the regulatory confusion was when the money is going from the manufacturer to the service provider, what do you do with that? And when it comes to A&P, that's where the confusion was. All nine defendants here got it right. They all correctly decided that money they paid to the wholesalers for services should be excluded from A&P. And we don't take issue with the notion of wanting to claw back price increases. But think about it. This is what the defendants did. They executed these contracts and said, we keep the profit if we raise prices. We'll claw it back. They raised prices. They clawed back the money. This is not money going from them to the wholesalers, money that the wholesalers paid to them for price increases. So there's two critical words here. Service fee, which is a service by the wholesaler, and price. Even calling it a price appreciation credit is a huge admission. They're taking dollar for dollar. You say always that the defense cites to a specific contract to try to illustrate that the purpose of this new way of paying distributors had to do with trying to get them to stop stockpiling drugs because that might have a lot of implications for the public. And cited a specific contract that appeared to be addressing that very issue, saying if there's a price increase for stock that you have only had for between this many and this many months, you get to keep the price increase. But if it's more than six months, that's a price appreciation credit back to us because it looks like you've been stockpiling too much inventory. Right, and we don't take issue with that. If I were the manufacturers, I'd want that money too. Why should they get paid twice? I agree with my opponent here. The question is once you take the money back, what do you do with it? It's not a service fee. The manufacturer has had nothing to do with what the wholesaler did. The wholesalers get paid the same amount every time whether there's a price increase or not for the same services. But the question is so we don't find that Mr. Streck is fine with the notion of the manufacturers taking that money back, that arbitrage. The question is once the money comes back, what do we do with it? And that's where they created this fiction. I'm just going to switch gears here a little bit. Do you conceive that the test articulated in SAFECO under the Fair Credit Reporting Act is the proper test under the Fair Claims Act? More or less, Your Honor, and I'll say it this way. That was the Fair Credit Reporting Act. The definition of mens rea or santo in that case is willful failure. It seems arguably higher than reckless disregard, but the Supreme Court more or less equated them in SAFECO. There is a deliberate ignorance state of mind that wasn't addressed in SAFECO, and we think that that applies to the False Claims Act. So in this instance, we essentially are arguing deliberate ignorance because everything that existed in the regulatory authorities when it comes to price said you have to include it in AMP. And there's not one citation in any of the briefing, anywhere in the record, where there's an authority that says you can raise prices, keep the money, and not report it in AMP. It's uniform that price increases are AMP, and the defendants have created a fiction, and they fooled the district court, and here we are, and the only question is who pocketed the money. And in this instance, it was the manufacturers. Thank you, Your Honor. Thank you, Counsel. We'll take the case under review.